UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                             :

MICHAEL CARUSO,                    :

                    Plaintiff,   :

            -v-           :

CITY OF NEW YORK, et al.,      :

                 Defendants.  :
                             :
-------------------------------------------------------- X

No. 06 Civ. 5997 (RA)

OPINION AND ORDER

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 2 6 2013

RONNIE ABRAMS, United States District Judge:

      Plaintiff Michael Caruso, a former Inspector General at the New York City Department

of Investigation ("DOI") brings this action pursuant to 42 U.S.C. § 1983 and state law alleging

that he was terminated by his former employer in retaliation for his grand jury testimony

regarding Bernard Kerik, the former Commissioner of the New York City Police Department.

Kerik was investigated by a Bronx County grand jury for conduct that occurred while he was

serving as the Commissioner for the New York City Department of Correction ("DOC") and

while Caruso was serving as the Inspector General for DOC, responsible for overseeing Kerik's

and other employees' conduct.  The grand jury was investigating, *inter alia*, whether Kerik

attempted to influence criminal and administrative investigations of Interstate Industrial

Corporation ("Interstate") and received undisclosed benefits from Interstate in the form of

renovations to his apartment located in Bronx, New York.  In March 2006, Caruso testified

before the grand jury regarding a meeting he attended in July 1999 during which Kerik, in an

apparent effort to influence the investigations, offered the assistance of two employees to an

agency investigating Interstate.  This action arises from Caruso's testimony and his termination

shortly thereafter.

Defendants the City of New York, Rose Gill Hearn, the Commissioner of DOI, Walter Arsenault, the former First Deputy Commissioner of DOI, Dan Brownell, the former Deputy Commissioner for Investigations, Marjorie Landa, DOI's general counsel, and Robert Roach, the former DOI chief of staff (collectively, "Defendants") move for summary judgment on all of Caruso's claims.  According to Defendants, Caruso was terminated not because of his grand jury testimony but due to DOI's ongoing concerns relating to Caruso's relationship with Kerik and his insubordinate behavior in response to Defendants' proposal to transfer him within DOI. They also argue that Caruso's testimony is not protected by the First Amendment because he was speaking as a government employee pursuant to his official duties.  For the following reasons, Defendants' motion is denied as to Caruso's claims of retaliation under federal and state law and granted as to Caruso's claims of wrongful discharge and defamation.

I.      **Background**

A.      **Factual Background[1]**

1.      **Caruso's Employment at the Department of Investigation**

DOI is an agency of the City of New York that is "empowered, *inter alia*, to investigate the 'affairs, functions, accounts, methods, personnel or efficiency of any [New York City] agency.'"  (Defs. 56.1 ¶ 1 (quoting N.Y.C. Charter Ch. 34, § 803(b)).)  The individual Defendants were employees of DOI during the time period relevant to this action.  (Id. ¶ 6.)

---

[1]      The following facts are drawn from Defendants' Rule 56.1 statement ("Defs. 56.1") and Caruso's response thereto ("Pl. Resp. 56.1"), as well as the exhibits incorporated therein.  Where one party's Rule 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute the fact, or merely objects to inferences drawn from the fact.

Caruso was employed by DOI from 1987 until his termination on March 28, 2006, effective March 31, 2006. (Id. ¶¶ 7, 66.)  At the time of his termination, he held the positions of Assistant Commissioner of DOI and Inspector General of DOC, the Department of Probation, the Department of Juvenile Justice, the Office of Emergency Management and the Taxi and Limousine Commission. (Id. ¶¶ 7-9.)  There is an Inspector General for each city agency, all of whom report directly to the DOI Commissioner. (Id. ¶ 3.)  Inspector Generals are responsible for the investigation and elimination of corrupt or other criminal activity, conflicts of interest, gross mismanagement or abuse of authority within the agency to which they are designated.  (Id. ¶ 3 (citing N.Y.C. Exec. Order 105 § 3(a)(i), Exec. Order 78 § 4(e).)  Upon receiving any information of this sort, they are obligated to report it directly and without undue delay to DOI pursuant to New York City Executive Order 78 § 4(e). (Id. ¶ 5.)

Given the responsibilities of DOI—the agency empowered to investigate wrongdoing within city government—it is undisputed that the public's perception of the Department is not only important but affects DOI's ability to carry out its mandate. (Id. ¶ 19 (citing Michael Caruso Dep. ("Caruso Dep.") 31:9-32:1)[2]; Defs. Ex. L (Email from Landa to Gill Hearn, Mar. 7, 2006), at 1 ("I acknowledge that DOI's reputation for independence and integrity is essential to our being able to effectively carry out our mandate.").)  If the reputation of DOI is diminished, that presents a problem for the Department. (Id. (citing Caruso Dep. 368:20-22).)

---

[2]      The parties have submitted as exhibits excerpts from the depositions of Caruso, the individual defendants, and the following employees of DOI: Meera Cattafesta, Tim Crowe, Daniel Alejandro, Julio Rodriguez and Vincent Greene.  For ease of reference, the Court refers to the deposition excerpts by the deponent's name only.

### 2.      Caruso's Relationship with Bernard Kerik

The DOC was within Caruso's purview of responsibility throughout his tenure at DOI. (Id. ¶ 10.)  For a period of that time, Bernard Kerik served in executive roles at the DOC, first as Deputy Commissioner from 1995 to 1998 and then as Commissioner from 1998 to 2000.  (Id. ¶ 13.)  In these capacities, Caruso and Kerik developed a working and social relationship, (id. ¶ 14), although Caruso has characterized their personal relationship as "limited," (Pl. Resp. 56.1 ¶ 14; Defs. Ex. B (Michael Caruso Grand Jury Testimony, Mar. 21, 2006 ("Caruso Grand Jury Tr.")), at 30:21-23 ("I had a daily working relationship with him since he was a Corrections commissioner and then a social relationship to a certain extent.")).  Among other interactions, Caruso attended Kerik's wedding with other city officials, Kerik called Caruso from the hospital after he and his wife had a baby, and Caruso attended his child's christening.  (Caruso Dep. 183:22-84:9, 214:19-215:5; Caruso Grand Jury Tr. 31:2-3.)  Caruso also assisted in preparing Kerik for his interview to be the Commissioner of the NYPD and was at Kerik's apartment the night he was appointed to that position.  (Caruso Dep. 215:6-217:9, 218:1-220:6 (describing his assistance to Kerik as not within his professional capacity).)  Kerik served as Police Commissioner from 2000 to December 31, 2001.  (Defs. 56.1 ¶ 13.)

Beginning in at least 2001—when Kerik's autobiography entitled Lost Son was published, in which he references his relationship with Caruso—their relationship became a mounting source of concern for DOI and the subject of criticism for Caruso.  (Marjorie Landa Dep. ("Landa Dep.") 44:6-10, 208:16-19; Defs. Ex. U (press articles between 2002 and 2005 regarding, in relevant part, Kerik and Caruso's relationship); id. at 1 (Newsday, Fears Over Ties in Rikers Probe, Oct. 31, 2002 ("In . . . Kerik's autobiography, Kerik hails Michael Caruso . . . as one of his 'closest friends and colleagues.'")).)  Consequently, in 2002 and on one or two

4

occasions in December 2004, DOI executives instructed Caruso to have no further communications with Kerik. (Caruso Dep. 154:9-155:18; Pl. Ex. H (Landa Notes, Dec. 27, 2004, at 9 ("12/7 RGH tells Mike not to speak to Kerik at all (Odeon lunch[)]")).) Moreover, Caruso was at least twice recused from investigations involving Kerik, once on his own initiative and once at the direction of DOI. (Caruso Dep. 151:7-152:3.) Recusal was necessary because if the relationship between the Commissioner of an agency and its Inspector General is too close or strained, it impedes the Inspector General's ability to do his job. (Id. at 80:21-83:18; see also Landa Dep. 44:13-17 ("[T]he fact that we need to be perceived as objective is critical to our being able to fulfill our mission.").) Caruso was recused from DOI's 2004 investigation into Kerik's dealings with Interstate, which ultimately led to his conviction. (Defs. 56.1 ¶ 21.)

Concerns about Caruso and Kerik's relationship appear to have escalated with the commencement of the Kerik investigation in December 2004. On December 27, 2004, Caruso attended a meeting with Commissioner Gill Hearn, Brownell and Landa regarding Caruso's relationship with Kerik. (See Defs. Ex. P (Email from Gill Hearn to Brownell, Dec. 20, 2004 ("I am sure you are aware that we have a problem with Mike on our hands. A big one."); Pl. Ex. H.) During the meeting, Caruso recounted two series of phone calls he had with Kerik in December 2004, among other things. He first described his participation in phone calls between December 3rd and December 6th with Kerik and Jeannette Pinero—an employee of DOC with whom Kerik had a prior personal relationship—relating to a pending litigation in which both Kerik and Pinero were to be deposed. (Pl. Ex. H at 7-11; Caruso Dep. 195:14-206:20; Rose Gill Hearn Dep. ("Gill Hearn Dep.") 29:4-7, 32:2-33:6.) Through these calls, Caruso effectively served as a conduit between Kerik and Pinero because Kerik did not want to have direct contact with Pinero in light of her upcoming deposition. (See Caruso Dep. 198:22-99:6; Defs. Ex. M (Landa Mem., Mar. 13,

2006) at 4 (Landa believed that "Kerik and Pinero had used him to help them to communicate with each other and in this he had allowed himself to be manipulated.").)  At the December 27th meeting, Caruso also discussed phone calls he had with Kerik between December 1st, the night of DOI's holiday party, and December 13th, all regarding his nomination and subsequent withdrawal of his nomination for United States Secretary of Homeland Security.  (Pl. Ex. H at 7-11; Caruso Dep. 188:18-192:4, 192:19-194:11, 206:23-208:19; Landa Dep. 307:22-308:5; Dan Brownell Dep. ("Brownell Dep.") 86:6-16 (noting that he learned of Kerik's call during the holiday party).)

### 3.    The 1999 Meeting at Walker's and Investigations into Kerik

As referenced above, in 1999, Interstate and its owners, the DiTommasos, were under investigation by both DOI and the New York City Trade Waste Commission ("TWC"). Although Caruso did not conduct this investigation on behalf of DOI, he attended a meeting in July 1999 between Kerik, then DOC Commissioner, and Ray Casey, the TWC Deputy Commissioner, during which the investigations were discussed.  (Caruso Grand Jury Tr. 31:14-32:10.)  The meeting, which was held at Walker's restaurant in lower Manhattan, was set up by either Kerik or Casey and neither was surprised to see Caruso in attendance.  (Id. at 32:13-33:10.)  During the meeting, Kerik and Casey discussed Interstate and the DiTommasos and Kerik offered two employees of Interstate—Larry Ray, an acquaintance, and Donald Kerik, his brother—to assist Casey in the ongoing probe of the company.  (Id. at 33:25-34:8.)  In effect, Kerik was "trying to influence" the investigations on Interstate's behalf by offering these employees to Casey.  (See Walter Arsenault Dep. ("Arsenault Dep.") 105:12-18; Defs. 56.1 ¶ 31 ("Kerik lobbied Casey on Interstate's behalf.").)  Caruso did not report the Walker's meeting at the time it occurred as required by Executive Order 78 § 4(e).  He later informed his DOI

superiors of his presence at it and what transpired at the December 27, 2004 meeting discussed above. (Pl. Ex. H at 1 ("Kerik offered Casey Larry Ray as person on the inside[.]").)

DOI, together with the Bronx District Attorney's Office, commenced an investigation into Kerik in mid-December 2004. The investigation related to, *inter alia*, Kerik's lobbying of TWC on behalf of Interstate, as well as his undisclosed receipt of benefits from Interstate. (Defs. 56.1 ¶¶ 17, 31.) On June 30, 2006 Kerik pled guilty to two misdemeanor violations: accepting a valuable gift from a firm intending to do business with the city in violation of New York City Charter § 2604(b)(5), and failing to disclose a loan in the Annual Disclosure Report filed with the New York City Conflicts Board in violation of New York City Administrative Code § 12-110(b)(15).[3] (Defs. 56.1 ¶¶ 17, 69; Defs. Ex. K (Bernard Kerik Plea Hr'g, June 30, 2006).) As the prosecutor represented to the court at Kerik's plea, Kerik had had "allowed his office as Correction Commissioner . . .  to be used for a meeting between [interstate] and [TWC] regarding their investigation of [Interstate]," and had "accept[ed] a valuable gift in the form of renovations to his Bronx apartment."[4] (Defs. Ex. K at 7:15-8:13.)

Arsenault, an executive at DOI at the time, was cross-designated as a Special Assistant District Attorney for purposes of the  investigation. (Arsenault Dep. 9:9-16.) Because of his relationship with Kerik, Caruso was recused from the investigation, although he did testify before the Bronx grand jury on March 21, 2006. A substantial portion of his testimony related to the 1999 Walker's meeting. Caruso's pending claims against Defendants arise from this testimony.

---

[3]        Kerik was also the subject of a federal investigation that resulted in felony convictions. (Defs. 56.1 ¶ 18.)

[4]        There was no direct evidence, however, of an agreement between Kerik and the DiTommasos that the renovations were given in return for Kerik's assistance with the city regulators. (Defs. Ex. K at 8:14-20.)

4.      **Events in Early 2006 Leading to Caruso's Termination**

a.      **February-March 19, 2006: DOI's Plan to Transfer Caruso**

As previously noted, for several years beginning in or around 2001, Caruso was the subject of criticism from the press regarding his relationship with Kerik.  Prior to 2006, DOI would defend Caruso with the response that he "had no real friendship with Kerik."  (Defs. Ex. M at 2.)  According to Landa, DOI was able to make this representation because they "had been told by . . . Caruso that, in fact, they weren't really friends and, following Kerik's leaving [DOC], [he] had only had something like two or three interactions with Kerik."  (Landa Dep. 283:4-11.)  As the Kerik investigation progressed and an indictment was forthcoming, however, Defendants' concerns about Caruso's relationship with Kerik and its potential impact on DOI intensified.  For instance, Caruso recalled a March 3, 2006 meeting with DOI spokesperson Emily Gest during which "the topic of the Kerik [g]rand [j]ury came up" and Gest "told [him] that the papers would go after [him] again."  (Defs. Ex. O (Caruso Mem., Mar. 26, 2006).)  When she raised the possibility of a transfer within DOI, he rejected it because he felt "it would look like [he] did something wrong."  (Id.)

On March 6, 2006, Gill Hearn emailed Landa asking whether her "view remains that Mike should/can stay in the agency but moved to a different unit; or is that insufficient under the totality of the circumstances."  (Defs. Ex. L (Emails between Gill Hearn and Landa, Mar. 6-7, 2006).)  In so doing, Gill Hearn noted that this is a "tough decision."  (Id.)  On March 7, 2006, Landa responded with two perspectives.  First, from "a pure [Inspector General] perspective," she stated:

> I do not believe that Mike's conduct warrants his having to leave DOI.  While an error in judgment, the phone calls were not illegal, unethical or in violation of the Conflicts of Interest Law.  They did not constitute an abuse of authority. . . .

8

> While I do not believe that Mike's conduct with regard to the phone calls warrants his leaving DOI because it does not make me doubt his ability to perform his job as an IG or an AC, I think it highlights the fact that Mike has been at DOC for too long and would be most effective applying his talents elsewhere.  That is why I previously advocated moving him to another area within DOI.

(Id. at 1.)  From her "perspective . . . as counsel to DOI," she recommended:

> [O]ther factors need to be taken into consideration . . .  bad press and doubts about DOI's independence that will result from disclosure of the phone calls and the implication they have for Mike's relationship to Kerik. . . . While criticism of Mike and DOI in the press has been largely unfair in the past and while I do not believe that we should take actions that are otherwise not warranted simply to protect ourselves from bad press, I acknowledge that DOI's reputation for independence and integrity is essential to our being able to effectively carry out our mandate.  Accordingly, when the firestorm occurs that will result from knowledge of the phone calls being made public (both the calls with Pinero and Kerik regarding the depositions and the calls with Kerik regarding the Homeland Security appointment) are taken into account, I think the agency would be better off if Mike moved on to another job.

(Id.)

On Friday, March 10, 2006, Commissioner Gill Hearn met with Caruso, Landa and Brownell.  Both Landa and Caruso prepared internal memoranda transcribing what occurred at the meeting.   According to Landa's memorandum dated March 13, 2006, Gill Hearn informed Caruso that, "as part of the reorganization of the office," he was being transferred to be the Assistant Commissioner for the Parks Department and the Department of Sanitation, among other responsibilities not yet finalized.  (Defs. Ex. M at 1.)  Caruso responded that the transfer "was O.K. and that he would do whatever she asked of him."   (Id. at 2.)  Gill Hearn then explained that an additional reason for the transfer was:

> the anticipated criticism that DOI will face if and when Bernie Kerik is indicted in the Bronx.  As with the criticism leveled at DOI in the past, Commissioner Gill Hearn noted, questions will be raised as to why none of the problems that are the subjects of a possible indictment were discovered until now.  Specifically, she said, the suggestion will be made that the reason that DOI did not uncover the misconduct at the time it was happening is that Mike was too close to Kerik and

so did not question what he saw, including the lavish renovations of Kerik's apartment that were not consistent with his City salary.

> Because of Mike's December 2004 phone calls with Kerik and Pinero, the Commissioner observed, any indictment of Kerik is going to pose new problems for DOI that were not there when DOI previously had to defend [DOI's] and Mike's actions and alleged inaction.  Commissioner Gill Hearn said that Emily Gest would now no longer be able to defend Mike with the argument that he had no real friendship with Kerik as she had previously.  However, the move away from the [DOC] would help to blunt the criticism that Mike was too close to Corrections to effectively be its Inspector General.

(Id.)  Although they did not know for certain if or when Kerik would be indicted, "the motivation to [e]ffect the transfer at this point in time came from the needs of the reorganization coupled with the fact that, should an indictment come down, [Gill Hearn] did not want the transfer to be perceived as a response to it."  (Id.)  She also informed Caruso that if Caruso decided he wanted to resign rather than transfer agencies, "it would be better for him and the agency" if he did so "before any indictment so that his resignation [was] not perceived to be a result of an indictment."[5]  (Id.)  According to Caruso, he did not know how to react to this explanation because "he did not know what he 'was being accused of.'"  (Id.)  Brownell explained that "there was a concern that the December phone calls took away DOI's ability to effectively defend" Caruso and the Department, while Landa stated:

> Mike was not being accused of anything illegal, unethical or a violation of the Conflicts of Interest Law, because if he were, we would not be having this conversation.  Rather, he would have been fired or asked to resign.  In this instance, I said, while we believed the calls to be a serious error of judgment, because of his strengths as a manager and our belief in his integrity, he was being asked to head up another unit and to leave Corrections because he was too close to people there.

(Id. at 3.)

---

[5]     Caruso disputes that the Commissioner made such a statement.  (Pl. Resp. 56.1 ¶ 55.)

After the meeting, Landa told Caruso that his participation in the Kerik/Pinero calls "was a mistake of judgment that stemmed from the fact that he was too close to the [DOC] and that was one of the reasons [she] supported his transfer." (Id. at 4.) Caruso then inquired if Gill Hearn was in fact trying to get him to resign, to which Landa responded that she did not believe that to be the case; rather, he was "truly valued at DOI." She did, however, note that "he not make the move unless he was fully prepared to commit to it." (Id.)

Caruso's memorandum dated March 12, 2006 substantially corroborates Landa's memorandum. Caruso additionally recalled that Landa stated, "I know this feels like you['re] getting sucker punched because we are telling you how great you are and how valuable you are to the agency right after we transfer you to another unit, especially after you have done nothing wrong." (Defs. Ex. N (Caruso Mem., Mar. 12, 2006) at 3.) He also noted that he "started to sense the transfer was coming." (Id.) Caruso further wrote that Commissioner Gill Hearn informed him that the transfer would take effect on Monday, March 27, 2006, his title would be "Assistant Commissioner" and his salary would remain the same. (Id. at 4.)

Defendants assert that Caruso was "displeased with the proposed transfer," (Defs. 56.1 ¶ 57), which Caruso disputes, (Pl. Resp. 56.1 ¶ 57). The record reflects that Caruso expressed concern that he might not be as "aggressive" at the Department of Sanitation because of its strong union ties, (Defs. Ex. M at 3; Caruso Dep. 269:3-5), and that he might not be as busy as he was with DOC, (Defs. Ex. M at 3; Caruso Dep. 268:25-269:1). According to Commissioner Gill Hearn, upon learning of his transfer, Caruso "threw his head back, and stared up at the ceiling and slumped down, and said to [her], I ain't going to lie to you, I'm not going to give it my all." (Gill Hearn Dep. 9:18-21.) She described his response to the transfer as "belligerent." (Id. at 10:14-16.) Caruso, on the other hand, acknowledged that he "wasn't thrilled" with the

11

transfer but claimed that "at the end of the day [he] wasn't that upset." (Caruso Dep. 267:25-268:5.) He denied expressing disappointment or frustration about the decision or indicating that he was not going to "give it [his] all" in executing his duties. (Id. at 268:6-22.) He further recalled that he told Gill Hearn that he "would do a good job and . . . would not 'lay down' on her and just collect a salary." (Defs. Ex. N at 4; see also Caruso Dep. 269:9-11.)

By the following week, Caruso began to explore other employment options. During a conversation with Brownell on or about March 14, 2006, Brownell suggested that Caruso might be interested in a position at the New York City Administration for Children's Services ("ACS"), (Gill Hearn Dep. 11:13-20; Caruso Dep. 114:6-17, 279:4-10), and commented that "it would probably be better to move on somewhere else," (Brownell Dep. 107:23-108:2). Caruso expressed interest in the ACS job and received assistance from Defendants in furtherance of this prospect, among others. (See Caruso Dep. 291:17-20.) Commissioner Gill Hearn sent an email to the commissioner of ACS recommending Caruso for the position, (Defs. Ex. R; Gill Hearn Dep. 12:4-7), and Landa assisted Caruso with updating his resume, (Caruso Dep. 114:23-115:20; 295:6-296:7; Landa Dep. 364:14-18; Gill Hearn Dep. 11:21-25). According to Gill Hearn, DOI was "becoming the employment arm for Mike Caruso." (Gill Hearn Dep. 24:14-15.)

### b.    March 20-21, 2006: Caruso's Preparation for, and Testimony in, the Grand Jury

On Tuesday, March 21, 2006, Caruso testified before the Bronx grand jury investigating Kerik.[6]  Caruso had testified before grand juries on several other occasions as part of his responsibilities as Inspector General and Assistant Commissioner. (Defs. 56.1 ¶ 12.)

---

[6]     At oral argument, the Court asked Caruso's counsel whether Caruso was subpoenaed to testify, which he could not answer. In a post-argument submission, counsel clarified that "Caruso was asked to testify by his government employer. DOI, acting through [D]efendant Arsenault, specifically requested that Caruso testify before the grand jury." (Pl. Letter, June 17, 2013, at 2.)

To prepare for his testimony, Caruso met with Arsenault and Brownell on or about March 20, 2006 for approximately thirty to forty-five minutes.  (Caruso Dep. 369:18; Arsenault Dep. 77:6-7.)   During that preparation session, they discussed Caruso's anticipated testimony regarding the July 1999 meeting at Walker's, including his recollection of what Kerik said concerning Larry Ray, Interstate and the DiTomassos.  (Arsenault Dep. 75:3-78:9.)  In an email to Commissioner Gill Hearn on March 20, 2006, Arsenault reported that Caruso was "fine, cooperative and [with] his usual almost total recall."  (Defs. Ex. Q.)  On the morning of March 21, 2006, Arsenault and Caruso met again just prior to entering the grand jury.  (Arsenault Dep. 75:6-20.)  According to Caruso, Arsenault told him, "remember Kerik vouched for Larry Ray at the Walker's meeting and everything will be okay," (Caruso Dep. 117:2-9), which Arsenault disputes, (Arsenault Dep. 75:21-76:11).   Caruso asserts that it was wrong for Arsenault to instruct him in such a manner because Arsenault knew from the prior preparation session that he could not testify to that fact because "that was never said, to the best of [his] knowledge." (Caruso Dep. 117:10-118:1.)  Thus, according to Caruso, Arsenault was instructing him to lie in his testimony.  (Id. at 118:9-10.)

Caruso's grand jury testimony on March 21, 2006 revolved in large part around the Interstate investigation and the meeting Caruso attended at Walker's.  The following exchanges took place between Arsenault and Caruso:

Q: Okay.  Please explain to us what happened at [the Walker's] meeting.

A: During the meeting, Bernard Kerik basically told [the TWC Commissioner] Ray Casey that Larry Ray was employed [at Interstate] which Ray [Casey] was already aware of, that Kerik's brother was [at Interstate], Donald Kerik, which Casey was aware of, and he offered them—if Ray Casey needed any assistance in the ongoing probe that he was conducting, that—Kerik said, you know, Larry Ray would be made available to him or his brother would be made available to him, him meaning Ray Casey.  Casey asked him how he knew Larry Ray.  Kerik said

13

he knew him for some time and that Larry Ray in the past had been a federal informant I believe he said for the FBI. He then invited Ray Casey to check, if he wanted to check or confirm, he said speak to his FBI handlers which would be the people assigned to Larry Ray when he was an informant. I believe he said that he was an informant for the FBI.

Q: At any time at the meeting, did Ray Casey ask Bernard Kerik whether or not he, meaning Ray Casey, and the [TWC] could trust Larry Ray?

A: I don't remember the exact words, but I believe that was—it was a question similar to that that prompted Kerik to say that he knew him for a number of years and he should check with his prior FBI handlers when he was an informant.

Q: What did you understand Kerik to be saying when he said I knew Larry Ray for a number of years with regard to his trustworthiness?

A: It's not like they just met.

Q: What else was discussed at the meeting?

A: There was a conversation where Kerik had told Ray Casey if he needed any assistance regarding surveillance devices, reviewing any records, that he would make Larry Ray available to him to assist him with that.

. . .

Q: Continue. What else do you recall about the meeting?

A: Just Kerik on a couple of occasions offering Larry Ray, Larry Ray's assistance, whether or not Ray Casey wanted to speak to him to give him the background of the company, what he sees at the company on a daily basis, discussion along those lines.

Q: All right. Now, from the conversation that you heard, did it appear that Ray Casey had already spoken with Larry Ray or that Ray Casey's people had spoken to Larry Ray or it was something to be accomplished in the future?

A: My understanding is it was something that was going to be done in the future.

(Caruso Grand Jury Tr. 33:23-35:11, 36:23-37:12.) Arsenault also inquired into Caruso's views as to why he attended the Walker's meeting:

Q: Do you have a sense of why you were invited to this meeting at Walker's?

14

A: Afterwards, yeah.

Q: Why?

A: Just I think it was protection for both individuals.  This way, one couldn't make an accusation against the other as to what transpired there.

Q: Why would that be necessary between the Corrections Commissioner and the deputy commissioner for Trade Waste?

A: My personal feeling is there was friction between the two of them.

(Id. at 49:19-50:6.)  Upon further questioning from Stephen Bookin, Chief of Investigations for the Bronx District Attorney's Office, Caruso testified:

A: And when Casey told me that he was, that they had no evidence at all against [Donald Kerik] that his brother should quit there, it was at that meeting at Walker's that Kerik offered up his brother or Larry Ray to cooperate in their investigation if they needed any type of surveillance devices, installed cameras, tape recorders on phones.

…

Q: And I think you testified that at that meeting, Bernard Kerik said to Ray Casey—he offered his brother's services, Donald Kerik's services, to further the investigation of the Trade Waste Commission into Interstate, correct?

A: His brother and Larry Ray, correct.

Q: So at that point, a couple of weeks later, you heard with your own ears that Mr. Bernard Kerik was offering the services of his brother and an employee to Mr. Casey to further the investigation, correct?

A: Correct.

(Id. at 52:25-53:6, 53:25-54:11.)   Also during his testimony, Caruso testified as to Kerik's relationship with Larry Ray:

Q: Okay.   And I show you what has been marked Grand Jury 135 for identification and ask if you recognize it?

A: Yes.

15

Q: What do you recognize it as?

A: It's a memorandum from Bernard Kerik to myself on March 6, 2000, subject Lawrence Ray, basically saying that Lawrence Ray was arrested and that he's going to suspend his relationship with Lawrence Ray pending the outcome of the case.

[Document moved into evidence; the witness is asked to read it aloud to the Members of the Grand Jury.]

It's dated March 6, 2000.  It's to myself, Michael Caruso, Assistant Commissioner/Inspector General from Bernard Kerik.

Subject: Lawrence Ray

As you are aware, Mr. Lawrence Ray, a close personal friend of mine, has been arrested based on federal indictment out of the Eastern District of New York. . . . My relationship with Mr. Ray and his family dates back approximately eight to nine years.  During that period of time, I've only known him to be a person of unquestionable character and highest integrity. . . .

(Id. at 44:15-46:10.)

The parties are in agreement—and the transcript confirms—that neither Arsenault nor Bookin ever explicitly asked Caruso whether Kerik "vouched for" Larry Ray.  (Defs. 56.1 ¶ 34.) They disagree, however, about whether he did so in substance as well as about Arsenault's reaction to the testimony.  Defendants assert that, although never using the word "vouch," Caruso testified that "Kerik directly and indirectly vouched for Larry Ray."  (Defs. Mem. 6.)  In any event, Arsenault testified that Caruso's testimony was consistent with what Caruso had told him previously and with what he told another prosecutor from the Bronx District Attorney's Office.  (Arsenault Dep. 78:10-15.)  Moreover, Arsenault testified that he was "very pleased" with Caruso's testimony, describing it as "candid" and "truthful."  (Id. at 90:2-7; see also Robert Roach Dep. ("Roach Dep.") 65:11-13 ("I only know that Walter said at some point he did fine, that he was satisfied.").)  Arsenault relayed his views to Gill Hearn, telling her that Caruso "did a

16

good job, he was candid and truthful and it helped us in the case." (Arsenault Dep. 90:8-13.) According to Arsenault, Caruso's testimony "was not the lynchpin or even an important part of the case. It was corroboration[.]" (Id. at 89:4-10.)

Caruso disputes Defendants' assertions. (Pl. Resp. 56.1 ¶ 33.) He contends that he could not and did not testify as directed and that Arsenault was not pleased with his testimony. (Caruso Dep. 117:10-20; Pl. Opp'n 6.) In contrast to Arsenault's testimony that he did not discuss Caruso's testimony with him after it occurred, (Arsenault Dep. 110:21-24), Caruso testified that they had a telephone conversation the following day, (Caruso Dep. 111:11-112:4). According to Caruso, during that call, Arsenault stated, "with an attitude," that his grand jury testimony "went all right." (Id.) Caruso further contends that he complained to Arsenault that Bookin had been "yelling and trying to put words in [his] mouth," to which Arsenault responded, "I got no problem with that." (Id. at 112:2-4.) Caruso also disputes that Arsenault did not believe Caruso's testimony to be an important part of the investigation. In notes from a meeting held on March 29, 2006, Meera Cattafesta, a deputy inspector general who reported to Caruso, documented that Arsenault told them that "the whole [Kerik] trial hinges on the Walker's meeting." (Meera Cattafesta Dep. ("Cattafesta Dep.") 54:9-55:9.)

### c.   March 21, 2006-March 28, 2006: Caruso's Termination and the Events Leading up to it

In an email sent by Commissioner Gill Hearn to Brownell and Roach on March 21, 2006 at 8:44 a.m., the morning of Caruso's grand jury testimony, Gill Hearn wrote, in relevant part, "I have a number of concerns about moving Mike to other agencies (DPR and DOS) if he is really looking to leave." (Pl. Ex. B (Emails between Gill Hearn, Brownell and Roach, Mar. 21, 2006).) Roach responded at 9:05 a.m. that "Mike needs to move now. . . . Unless we decide to ask him to

leave before he has another job, it will be at least 3 months before he can move to his next position," to which Gill Hearn responded, "Hurricane Mike/Kerik will have hit within/before 3 months.  It will have hit the agency (and as an aside, Mike)."  (Id.)  Brownell had separately responded to Gill Hearn's email at 9:09 a.m., to which she replied at 10:10 a.m., stating that "the physical moves are to happen by no later than the end of March."  (Id.; see also Brownell Dep. 113:15-114:4 (confirming that, according to these emails, Caruso's transfer was still in place).)  The record does not include the time of Caruso's grand jury testimony but one can reasonably assume that these emails were exchanged at least before the testimony was completed.

On what appears to be later on the day of Caruso's testimony, Commissioner Gill Hearn and Roach participated in a call with Arsenault "to discuss the Kerik investigation" and Caruso's testimony.  (Pl. Ex. A (Email from Roach, Mar. 24, 2006); Tim Crowe Dep. ("Crowe Dep.") 63:9-65:10 (recalling that Gill Hearn had told him that Arsenault updated her on Caruso's testimony).)  According to an email sent by Roach to himself on March 24, 2006, the Walker's meeting "had become a key issue in the case."  (Pl. Ex. A.)  At this meeting, Arsenault related that, according to the witnesses—Caruso, Casey and Diana Lee[7]—"[K]erik 'lobbied' Casey regarding the integrity of Interstate's owners," and that Ray and Don Kerik "helped 'clean shop'" at Interstate.  (Id.)  Roach recalled that he and Commissioner Gill Hearn "learned for the [first] time that as a result of this and other evidence that [the] Bronx DA was planning to charge 'rewarding official misconduct' . . . . Thus Mike was a first hand witness who did nothing as IG and violated his duty under EO 16."  (Id. ("Mike did not report this [Walker's] meeting at the time to DOI.").)  Roach also noted that DOI received a call from the press inquiring about

_____

[7]       Diana Lee was coordinating the Kerik criminal investigation for DOI with the FBI and the U.S. Attorney's Office.  (Arsenault Dep. 109:9-11.)

"Mike's improper relationship with Kerik."   (<u>Id.</u>)   As a result of this conversation, Roach reported, "on Tuesday and Wednesday, [Arsenault, Landa] and Dan Brownell spoke repeated[ly] and [] agreed that Mike had to leave DOI."   (<u>Id.</u>; <u>see also</u> Pl. Ex. C (Email from Roach to Landa, Mar. 23, 2006) ("[T]his is to confirm that in our meeting/conference call on Tuesday that Mike had to leave the agency.").)

Similarly, Meera Cattafesta, a Deputy Inspector General who reported to Caruso, wrote the following note based on a phone call she had with Tim Crowe, also a Deputy Inspector General who reported to Caruso, during which Crowe discussed a conversation he had had with Commissioner Gill Hearn on March 27, 2006:

> Things changed on Tuesday 21st.
> 1. The phone calls December 2004
> 2. After she was briefed by Walter @ Caruso's grand jury testimony

(Pl. Ex. K; Cattafesta Dep. 57:25-58:4 (confirming these notes were prepared based on a conversation she had with Crowe); <u>see also</u> Crowe Dep. 27:17-25 (confirming that the two spoke on March 27, 2006).)   At her deposition, Cattafesta testified: "I don't recall 100 percent but to the best of my recollection the notation things changed on Tuesday the 21st is something that Tim Crowe told me he had been told by Commissioner Gill Hearn."   (<u>Id.</u> at 66:2-7, 69:21-70:3 ("[T]o the best of [my] recollection . . . items one and two are the reasons that Tim Crowe provided to me, based on his conversation with Commissioner Gill Hearn, as to why [] Caruso's status changed within [DOI].").)   Neither Commissioner Gill Hearn nor Crowe recall Gill Hearn making this statement.   (Gill Hearn Dep. 158:7-12; Crowe Dep. 85:8-19.)   Crowe's notes from the March 27th call, however, reflect the following:   "[G]rand jury dash role, present for meeting, then in the upper right-hand part it says RGH updated by Walter 21st.   Then it says

Bernie Interstate illegal behavior in Mike's presence.  Mike as buddy, not DOI.  Didn't tell Diana Lee, no one from DOI.  Official misconduct.  COIB violation." (Crowe Dep. 63:9-18.)

On March 24, 2006, DOI executive staff—without Commissioner Gill Hearn—met with Caruso and asked for his resignation.  Caruso responded that he would only do so if DOI "found him another city job."  (Pl. Ex. A; Caruso Dep. 344:8-14.)  Caruso contends that Defendants' decision to terminate him was motivated by their dissatisfaction with his grand jury testimony.

Commissioner Gill Hearn disputes this contention and claims that Caruso's grand jury testimony did not play a role in her decision to terminate him.  (Gill Hearn Dep. 26:3-9.)  As noted above, she testified that she came to believe that Caruso was treating DOI as "the employment arm" for him, (id. at 24:14-15), and that they had to discuss this with him.  Thus, at her direction, DOI executives and Caruso convened on March 24, 2006, at which time they informed Caruso that they were not firing him but that they were giving him one month to "wind up his affairs" and "reach out to other City agencies about potential employment or to whomever."  (Id. at 17:18-25, 20:24-25.)  The executives indicated that they would serve as a reference for him and "at the end of a month, there would be a farewell event, and he would be sent off with the traditional thanks and well wishes from colleagues."  (Id. at 18:3-9.)  Following this meeting, Roach called Gill Hearn, who stated that Caruso responded to the foregoing by claiming, "[DOI] can't fire him and that he knows where, either the bones are buried or the body [is] buried."  (Id. at 18:10-21.)  His behavior, according to Commissioner Gill Hearn, was "unacceptable, insubordinate, belligerent . . . from start to finish, beginning in my office [on March 10th] and ending in that conversation."  (Id. at 25:6-9.)  Accordingly, she directed Roach to tell Caruso he was fired.  (Id. at 19:13-20:7 ("I had extended myself to him . . . over and over again over the years and that was the crossing of the line.").)

20

Caruso was terminated on March 28, 2006, as per Commissioner Gill Hearn's direction, effective on March 31, 2006.  (Defs. 56.1 ¶¶ 65-66; Gill Hearn Dep. 22:6-11.)

### B.      Procedural History

Caruso commenced this retaliation action on August 7, 2006, alleging that he was terminated in retaliation for his truthful testimony regarding Kerik's statements about Larry Ray at the Walker's meeting.  As a result of federal and state criminal proceedings related to Kerik and others, Caruso's grand jury testimony was under seal and discovery in this case was thus stayed.  Once those proceedings concluded, on April 20, 2011, Caruso's grand jury testimony was unsealed by Order of the New York Supreme Court, Bronx County, and discovery proceeded in this case.  On January 18, 2012, the Honorable Paul Engelmayer, to whom this case was previously assigned, denied Defendants' motion for judgment on the pleadings, and on February 3, 2012, he denied Defendants' motion for reargument.  (Dkt. Nos. 70 & 82.)  The case was reassigned to this Court on July 9, 2012, and Defendants subsequently filed this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, Defendants' motion is denied in part and granted in part.

## II.      Standard of Review

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is material if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

The moving party bears the burden of showing that it is entitled to summary judgment. See id. at 256. "In determining whether a case presents triable issues of fact, [the court] may not make credibility determinations or weigh the evidence, and [it] must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007) (internal quotations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48. A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial," id. at 248, which must be supported by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "[I]f there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot obtain [] summary judgment." Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007).

## III.   Discussion

### A.   Caruso's First Amendment Retaliation Claim

"To survive summary judgment on a First Amendment retaliation claim, a public employee must bring forth evidence showing that [(1)] he has engaged in protected First Amendment activity, [(2)] he suffered an adverse employment action, and [(3)] there was a causal connection between the protected activity and the adverse employment action." Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011) (internal quotation marks omitted). If the plaintiff makes out such a prima facie retaliation claim, summary judgment for the defendant is not appropriate unless it can establish as a matter of law either of two defenses: (1) the defendant "would have taken the same adverse employment action 'even in the absence of the

protected [speech],'" see Cotarelo v. Sleepy Hollow Police Dep't, 460 F.3d 247, 251-52 (2d Cir. 2006) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); or (2) "the plaintiff's expression was likely to disrupt the government's activities and . . . the harm caused by the disruption outweighs the value of the plaintiff's expression." Anemone, 629 F.3d at 115; see also Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (explaining that if the "possibility of a First Amendment claims arises[,] [t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public") (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., 391 U.S. 563, 568 (1968)).   The second defense is commonly known as the Pickering balancing test.

Defendants make the following arguments in support of their motion for summary judgment: (1) Caruso's claim fails because, contrary to his allegations, he did indeed testify, in sum and substance, that Kerik "vouched" for Larry Ray at the Walker's meeting; (2) Caruso's grand jury testimony was not protected speech because it was made pursuant to his official duties; (3) Caruso cannot demonstrate that his grand jury testimony was a substantial or motivating factor in his termination; and (4) Defendants can satisfy the Mount Healthy defense.[8] The Court addresses each in turn.

### 1.    Interpretation of Caruso's Grand Jury Testimony

Defendants contend that summary judgment should be granted in their favor because a review of the grand jury transcript reveals that "in sum and substance, Caruso did, in fact, repeatedly testify that Kerik vouched for Larry Ray at the Walker's meeting, as the word 'vouch'

---

[8]     It is undisputed that Caruso suffered from an adverse employment action when he was terminated by the Department of Investigation.  See Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

is commonly understood," and therefore there is no evidence to support "the essential element" of Caruso's claim—that he was terminated because he did not testify that Kerik vouched for Larry Ray at the Walker's meeting.  (Defs. Mem. 6.)  In response, Caruso asserts that Judge Engelmayer previously rejected this argument in denying Defendants' motion for judgment on the pleadings.  He further argues that the grand jury transcript reflects that, "[i]nstead of providing the requested testimony that Kerik vouched for Ray, [he] instead testified that Kerik simply told Casey he should check with other people."  (Pl. Opp'n 8.)  Both parties cite to language in Judge Engelmayer's order in which he states that "the grand jury transcript supplies substantial support for the argument that Defendants may have occasion to make later in the case that Caruso had in fact testified that Kerik had vouched for Larry Ray," but "the transcript is simply not conclusive enough on that point to justify dismissal at this stage."  (Jan. 18, 2012 Order at 10.)

As the parties acknowledge, Arsenault never asked Caruso whether Kerik "vouched for" Larry Ray and Caruso never used the word "vouch" to describe Kerik's statements to Ray Casey during the Walker's meeting.  Although the case is now at the summary judgment stage, Judge Engelmayer's conclusion that the transcript is "simply not conclusive enough on [this] point to justify dismissal" remains true.  Moreover, as noted by Judge Engelmayer, a "critical issue" in this matter is "whether Arsenault believed that Caruso had testified sufficiently on the vouching point to meet his, Arsenault's, expectations," which is "an ultimate issue of fact."  (Id. at 8 & 10 n.8.)  See also Redd v. N.Y. Div. of Parole, 678 F.3d 166, 178 (2d Cir. 2012) ("Issues of causation, intent, and motivation are questions of fact.").  As discussed in § III.A.3, this issue remains to be a disputed issue of fact for the jury to resolve.  Construing all ambiguities and drawing all reasonable inferences in Caruso's favor, and recognizing that the Court is not to

24

resolve conflicting versions of facts at summary judgment, Defendants' motion is thus denied on this basis.  See United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

### 2.    Protected First Amendment Speech

It is well settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti, 547 U.S. at 417. "A public employee, however, must 'by necessity . . . accept certain limitations on his or her freedom,' because, his or her speech can 'contravene governmental policies or impair the proper performance of governmental functions.'" Weintraub v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y., 593 F.3d 196, 201 (2d Cir. 2010) (quoting Garcetti, 547 U.S. at 418-19). This is so because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418.

In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court articulated a two-step test for assessing whether a public employee's speech warrants constitutional protection: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011) (citing Garcetti, 547 U.S. at 420-22). Under Garcetti, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. This is true even if the subject of

25

the speech involves a matter of public concern.  See Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012); see also Garcetti, 547 U.S. at 421 ("The controlling factor" is whether the employee was speaking "pursuant to [his] official duties.").  The questions of whether an employee spoke pursuant to his official duties and whether the speech was on a matter of public concern are both questions of law for the Court.  See Jackler, 658 F.3d at 236-37.

At issue in this case is whether Caruso's grand jury testimony is protected speech under the First Amendment.  "The duty to testify has long been recognized as a basic obligation that every citizen owes his Government."  United States v. Calandra, 414 U.S. 338, 345 (1974); Piemonte v. United States, 367 U.S. 556, 559 n.2 (1961) ("Every citizen . . . owes to his society the duty of giving testimony to aid in the enforcement of the law.").  In serving as a witness, a citizen is "bound not only to attend but to tell what he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry."  Blair v. United States, 250 U.S. 273, 282 (1919); see also Jackler, 658 F.3d at 239 ("[W]hen a person does give evidence, he has an obligation to speak truthfully.").  "[U]ninhibited testimony is vital to the success of our courts' truth-seeking function."  Catletti ex rel Estate of Catletti v. Rampe, 334 F.3d 225, 230 (2d Cir. 2003).

Given the "exceptional significance" of truthful testimony in the courts' pursuit of justice, the Second Circuit has long held that testimony of public employees in judicial or other fact-finding proceedings is protected by the First Amendment.  See, e.g., Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121, 125 (2d Cir. 2005); Catletti, 334 F.3d at 230; Lewis v. Cowen, 165 F.3d 154, 166 (2d Cir. 1999) (agreeing that the plaintiff "had a strong First Amendment interest in testifying truthfully" before the gaming board, but finding a lack of proof at trial to support his claim); Kaluczky v. City of White Plains, 57 F.3d 202, 210 (2d Cir. 1995)

26

("Voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment."); Piesco v. City of N.Y. Dep't of Pers., 933 F.2d 1149, 1157-59 (2d Cir. 1991), abrogated on other grounds by Waters v. Churchill, 511 U.S. 661 (1994); Dobosz v. Walsh, 892 F.2d 1135, 1141 (2d Cir. 1989) ("Dobosz clearly was exercising his right to free speech when he . . . testified against his fellow officer in court.").  "'[T]he foundations of federal justice will be undermined,'" the Circuit has explained, "if witnesses are not able to testify freely" for fear of retaliation by their government employers.  Catletti, 334 F.3d at 230 (quoting United States v. Pacelli, 491 F.2d 1108, 1113 (2d Cir. 1974)); Piesco, 933 F.3d at 1159 ("[R]equiring less than candor and honesty from witnesses [] appearing before legislative committees would undermine our system of government which is predicated on an informed and enlightened legislature.").

If a court were to find that a public employee's truthful testimony was not protected by the First Amendment, the employee would be "confronted with a Hobson's choice" if called upon to testify.  See Piesco, 933 F.2d at 1160.  He or she "could either (1) honestly answer the question, in which case, as a matter of law, she could be fired; (2) commit perjury; or (3) refuse to answer the question posed and be held in contempt."  Id.; Kaluczky, 57 F.3d at 210 ("There are evident policy reasons for encouraging truthful testimony and for insulating witnesses from retribution or the threat of retribution.").  "By offering a government employee the option of jail or unemployment," the court would be "chilling speech in a forum where candor is critical to informed decision-making," which is precisely what the Second Circuit has previously declined to do.  Piesco, 933 F.2d at 1160.

Although the cases cited above preceded Garcetti, their principles ring as true today as when they were written.  For that reason—and in light of the fact that the Supreme Court has not

yet had occasion to consider <u>Garcetti</u>'s application to a public employee's testimony—the Court rejects Defendants' argument that Caruso's grand jury testimony is not protected because he was speaking not as a citizen but pursuant to his official duties when he testified.  In so doing, the Court applies the principles set forth in the aforementioned Second Circuit cases involving testimony within the two-step <u>Garcetti</u> framework to conclude that, when he testified before the grand jury, Caruso was speaking "as a citizen rather than solely as an employee" on a matter of public concern.  His speech is thus protected by the First Amendment.

First, it is undisputed that Caruso was speaking on a matter of public concern when he testified about the events that occurred at the Walker's meeting between Kerik and Ray Casey. "Whether speech addresses a matter of public concern is determined 'by the content, form, and context of a given statement, as revealed by the whole record.'" <u>Catletti</u>, 334 F.3d at 229 (quoting <u>Connick</u>, 461 U.S. at 147-48).  "Exposure of official misconduct . . . is generally of great consequence to the public." <u>See</u> <u>Jackler</u>, 658 F.3d at 236.  Moreover, the context of Caruso's speech—testimony in the course of a judicial proceeding—further supports this conclusion.  As the Second Circuit has stated, "[t]he paramount importance of judicial truth-seeking means that truthful [] testimony is almost always of public concern." <u>Catletti ex rel Catletti</u>, 334 F.3d at 230; <u>see also</u> <u>Konits</u>, 394 F.3d at 125 ("[S]peech is of particular public concern when it involves actual or potential testimony in court or in administrative procedures.").

Second, although his attendance at the Walker's meeting and his testimony provided at Arsenault's request were "related to [his] job" as Inspector General, <u>see</u> <u>Weintraub</u>, 593 F.3d at 203 (quoting <u>Garcetti</u>, 547 U.S. at 421), Caruso was nonetheless speaking as a citizen and not "pursuant to his official duties" when he testified under oath before the grand jury.  The Court

28

finds the Second Circuit's decision in Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011), to be a useful starting point for this conclusion.  In Jackler, the Second Circuit held that a police officer was speaking as a "citizen on a matter of public concern" when he "refus[ed] to retract his truthful [r]eport and make statements that would have been false."  Id. at 242.  The Jackler court reasoned that, "[i]n the context of an official investigation into possible wrongdoing, a citizen has a right—and indeed, in some circumstances, a duty—to give evidence to the investigators. . . . A law enforcement officer does not, by reason of his public employment, lose his civic right to give evidence."  Id. at 239 (citing Kaluczky, 57 F.3d at 210, and Dobosz, 892 F.2d at 1141). Moreover, "when a person does give evidence, he has an obligation to speak truthfully," and failing to do so "expose[s] the speaker—whether he be a police officer or a civilian—to criminal liability."  Id. at 239-40 (citing 18 U.S.C. §1001, which makes it a federal offense to make false statements, and N.Y. Penal Law § 240.50, which prohibits the false reporting of an incident to law enforcement).

In Jackler, the court was careful to distinguish between the refusal to retract a truthful report and file a false one—which was protected—from the "mere filing of his initial [r]eport"— which it did not address.  658 F.3d at 241.  Consequently, the holding of Jackler has been construed narrowly by subsequent Second Circuit cases to apply only where the challenged speech involves the *refusal* to make a false statement.  See Ross, 693 F.3d at 307-08; Matthews v. City of N.Y., No. 12 Civ. 1354 (PAE), 2013 WL 3879891, at *11 (S.D.N.Y. July 29, 2013); Schoolcraft v. City of N.Y., No. 10 Civ. 6005 (RWS), 2012 WL 2161596, at *8-9 (S.D.N.Y. June 14, 2012).  The relevant speech in this case is Caruso's testimony and not simply his alleged refusal to testify falsely and his claim thus does not fit precisely into the narrow Jackler

framework.[9]   The Second Circuit's reasoning, however, in concluding that <u>Garcetti</u> did not bar protection of Jackler's speech, applies with equal force to the speech at issue here.

The obligation to testify truthfully, like the obligation to give truthful evidence, is not vitiated simply by the fact that a citizen is a government employee.  Truthful testimony is of paramount importance to the courts' functions regardless of whether the witness is a civilian or a public employee.  Indeed, in an analogous context, the Supreme Court has expressly stated that "[w]hen a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth."  <u>Rehberg v. Paulk</u>, 132 S. Ct. 1497, 1505-06 (2012) (quoting <u>Briscoe v. LaHue</u>, 460 U.S. 325, 335-36 (1983)).[10]   Otherwise, the Court recognized, "[w]itnesses 'might be reluctant to come forward to testify' and even if a witness took the stand, the witness 'might be inclined to shade his testimony in favor of the potential plaintiff' for fear of subsequent liability."  <u>Id.</u> at 1505 (quoting <u>Briscoe</u>, 460 U.S. at 333).  These concerns are just as true in the context of a public employee's fear of retaliation for truthful testimony.

---

[9]   Throughout this litigation, Caruso's claim has been construed in varied ways, both by the parties and by the Court.  At times, it has been characterized as a claim of retaliation for the refusal to testify falsely before the grand jury, (<u>see, e.g.</u>, Jan. 18, 2012 Order at 3 ("Caruso alleges that he was terminated for refusing to testify falsely to the grand jury[.]"); Defs. Mem. 1 ("Caruso claims that his employer . . . terminated him suddenly because he refused to give specific testimony in a Bronx [g]rand [j]ury . . . ."); Pl. Opp'n 4 ("The gist of plaintiff['s]" claim is that Defendants retaliated against him "for Caruso's refusal to testify falsely before a . . . grand jury.")), while at other times it has been characterized as a claim based on Defendants' dissatisfaction with Caruso's grand jury testimony, (<u>see, e.g.</u>, Jan. 18, 2012 Order at 8 ("The central premise of Caruso's complaint is that DOI . . . was dissatisfied with Caruso's testimony as to whether Kerik had vouched for Larry Ray."); Defs. Reply 4 ("[T]he retaliation claim is based on affirmative statements arising from job duties as opposed to the refusal to make false statements."); Pl. Opp'n 15 ("[A] fact finder could certainly draw the inference that defendants were not in fact pleased with Caruso's grand jury testimony, and a causal connection existed between defendants' displeasure with his grand jury testimony and his termination.").)  The Court ultimately relies on the allegations in the complaint—which more broadly allege that Caruso claims he was terminated for "providing truthful testimony to the Bronx County Grand Jury," (Compl. ¶ 39)—to reach the determination above.

[10]   In <u>Rehberg</u> and <u>Briscoe</u>, the Supreme Court held that trial and grand jury witnesses—including police officers—are absolutely immune from § 1983 actions, a necessary result to protect the "truth-seeking process at trial."  <u>Rehberg</u>, 132 S. Ct. at 1505-06.

The consequences of testifying falsely go well beyond retaliation at work.  Indeed, the obligation to testify truthfully is embedded in federal and state rules and procedures and the failure to testify truthfully while under oath exposes citizens and government employees alike to criminal liability under federal and state perjury statutes.  See 18 U.S.C. § 1621 ("Whoever having taken an oath before a competent tribunal . . . that he will testify, declare, depose, or certify truly . . . willfully and contrary to such oath states . . . any material matter which he does not believe to be true . . . is guilty of perjury and shall . . . be fined . . . or imprisoned not more than five years, or both."); N.Y. Crim. Proc. Law § 60.20 ("Every witness more than nine years old may testify only under oath . . . . A witness understands the nature of an oath if he or she appreciates the difference between truth and falsehood, the necessity for telling the truth, and the fact that a witness who testifies falsely may be punished.").  For reasons noted by the Second Circuit in Piesco, it simply cannot be that an employee is faced with the "Hobson's choice" of testifying truthfully under oath and getting fired without recourse or testifying falsely and committing perjury.

The Court's determination that Caruso was speaking as a citizen is further informed by cases in the Third and Seventh Circuits that have squarely addressed this issue.  In Reilly v. City of Atlantic City, 532 F.3d 216 (3d Cir. 2008), the Third Circuit held that "[w]hen a government employee testifies truthfully, s/he is not 'simply performing his or her job duties,' . . . , rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence."  Id. at 231.[11]  In reaching its conclusion, the court considered the well-established case law supporting the principle that "all citizens owe an independent duty to society to testify

---

[11]     The Third Circuit recognized that the speech at issue in its case "appear[ed] to have stemmed from [the plaintiff's] official duties," but nonetheless held that the employee was speaking as a citizen in testifying as a witness at a trial regarding corruption in the police department.  Reilly, 532 F.3d at 231.

in court proceedings." Id. at 229. This duty to testify truthfully is "the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee." Id. at 231. But see Huppert v. City of Pittsburg, 574 F.3d 696, 708 (9th Cir. 2009) (declining to follow Reilly and finding that, pursuant to Garcetti, a police officer's testimony before a grand jury that was investigating corruption in the police department was made pursuant to his official duties and thus not protected speech).

Moreover, in Chrzanowski v. Bianchi, 725 F.3d 734 (7th Cir. 2013), the Seventh Circuit recently held that "[w]hen a public employee gives testimony pursuant to a subpoena, fulfilling the 'general obligation of [every] citizen to appear before a grand jury or at trial,' . . . he speaks 'as a citizen' for First Amendment purposes." Id. at *5 (quoting Branzburg v. Hayes, 408 U.S. 665, 686 (1972)).[12] In so doing, the Seventh Circuit determined that the reasons pronounced by the Supreme Court to support its Garcetti decision are inapplicable in the context of compelled testimony. First, the rationale that restrictions on public employees' speech "do not infringe on any liberties" enjoyed as private citizens is inapposite. Rather, the individual person—including a public employee—has a "strong interest in complying with the demands of a subpoena: apart from whatever desire a public employee might have to assist in the administration of justice, failure to comply with a subpoena can result in lengthy incarceration." Id. at *6. Second, the public has a "substantial interest in hearing" testimony, which "often provides society with information that is essential for democratic self-governance." Id. Third, the rationale that a contrary ruling in Garcetti would place the court in a role of overseeing communications between

---

[12]    As previously noted, Caruso's counsel has advised the Court that Caruso was asked to testify by Arsenault on behalf of DOI. As in Piesco, although not subpoenaed, it is reasonable to infer that if Caruso did not appear before the grand jury, he would have been subpoenaed. See Piesco, 933 F.3d at 1151.

employers and employees and "displace . . . managerial discretion" is inapplicable.  See id. at *5 (quoting Garcetti, 547 U.S. at 423).  "[I]f the defendants [in Chrzanowski] had some legitimate managerial interest in dissuading Chrzanowski from testifying truthfully pursuant to a subpoena," the court stated, "we cannot imagine what it might be."  Id.  The conclusions of the Third and Seventh Circuits are further supported by language in Justice Souter's dissent in Garcetti, in which he stated that a "claim relating to truthful testimony in court must surely be analyzed independently to protect the integrity of the judicial process."  547 U.S. at 444.  The Court adopts the reasoning of these cases in concluding that Caruso was speaking as a citizen when he testified before the grand jury.

In so doing, the Court recognizes that the Second Circuit has twice ruled since Garcetti that a public employee's testimony was made pursuant to his official duties.  See Kiehle v. County of Cortland, 486 F. App'x 222 (2d Cir. 2012); Bearss v. Wilton, 445 F. App'x 400 (2d Cir. 2011).  Neither of these cases, however, addresses or even acknowledges the Second Circuit's testimony jurisprudence discussed above.  The cases are further distinguishable on their facts.  In Kiehle, the plaintiff, a case worker with Cortland's Department of Social Services, voluntarily testified in family court and represented her personal views and opinions as that of the department's.  486 F. App'x at 224.  Here, Caruso was asked—and likely would have been subpoenaed—to testify as a fact witness in an ongoing investigation.  And in Bearss, the plaintiff's testimony at a hearing regarding her job performance was "motivated by personal interest in responding to criticism of her job performance and not motivated by a desire to 'advance a public purpose.'"  445 F. App'x at 404.  The "absence of a citizen analogue" to a forum available to employees of the city further supported the court's finding that the speech was

not protected.  Id.  By contrast, not only was Caruso's testimony regarding a matter of public concern, but there is a clear citizen analogue to a public employee's grand jury testimony.[13]

The Court thus relies on the Second Circuit's jurisprudence protecting a public employee's First Amendment right to testify, supported further by the more recent cases outside the Circuit discussed above, in concluding that Caruso was speaking as a citizen when he testified before the grand jury.  See also Frisenda v. Inc. Vill. of Malverne, 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011) (finding that government employee's activities as a voluntary witness in a lawsuit are subject to constitutional protection under Kaluczky and Benedict v. Town of Newburgh, 95 F. Supp. 2d 136 (S.D.N.Y. 2000)); see also Whitehead v. City of N.Y., No 12 Civ. 0951 (ILG)(VVP), 2012 WL 8505908, at *7 & n.5 (E.D.N.Y. Oct. 15, 2012) (citing Frisenda and Benedict for the proposition that the act of "testifying truthfully . . . is constitutionally protected from retaliation" and distinguishing this case, where plaintiff had "merely offer[ed] to testify"); Cooper v. Metro. Transp. Auth., No. 04 Civ. 525 (LTS)(AJP), 2006 WL 1975936, at *4 (S.D.N.Y. July 14, 2006) ("In the Second Circuit, public employees have a clearly established First Amendment right to testify on matters of public concern.").

### 3.    Causal Connection

Turning next to the causation element of Caruso's retaliation claim, Defendants argue that Caruso cannot show that his testimony regarding the Walker's meeting was a substantial or motivating factor in his termination.  Defendants raise the following arguments in support thereof: (1) the timing of Caruso's termination is insufficient on its own to defeat summary judgment; (2) there is no direct or indirect evidence from which to conclude that Defendants

---

[13]    It is also worth noting that the opinions in Kiehle and Bearss are summary orders which do not have precedential effect under the Second Circuit's Local Rules.  See 2d Cir. R. 31.1.1(a) ("Rulings by summary order do not have precedential effect.").

were dissatisfied with Caruso's testimony, indeed, there is testimony that Arsenault was pleased with it; and (3) the "several pieces" of evidence on which Caruso relies in support of his claim are insufficient to defeat summary judgment.  (See Defs. Mem. 17-18.)  In response, Caruso asserts that the temporal proximity is sufficient to establish causation and that there is additional circumstantial evidence in the record to support an inference of causation.

"To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'"  Nagle v. Marron, 663 F.3d 100, 109 (2d Cir. 2011) (quoting Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006)).  An employee may establish causation directly, or he may establish it indirectly through circumstantial evidence, by showing that the employee's speech was "closely followed in time by the adverse [employment] action."  Nagle, 63 F.3d at 110 (quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001)); Pisano v. Mancone, No. 08 Civ. 1045 (KMW), 2011 WL 1097554, at *10 (S.D.N.Y. Mar. 18, 2011) (citing Cioffi, 444 F.3d at 168).  Although the Second Circuit "has not drawn a bright line defining the maximum time period that can give rise to an inference of causation," it has found six weeks to "fit comfortably within any line [it] might draw."  Nagle, 663 F.3d at 111; see also Adams v. Ellis, No. 09 Civ. 1329 (PKC), 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012) ("[C]ase law in the Second Circuit and in this district often finds a limit at two or three months and almost universally disapproves longer time periods.").[14]

---

[14]     Defendants' reliance on Walter v. Boehm, 309 F. App'x 531 (2d Cir. 2009) to support their position that temporal proximity is insufficient to satisfy the causation element is misplaced.  In Walter, the court recognized that causation "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," id. at 532, but found that the record in the case did not support an inference of causation from the timing of the plaintiff's firing because her termination was part of a period of office restructuring.

Caruso testified on Tuesday, March 21, 2006, and a decision to terminate—as opposed to transfer—him was reached if not on Wednesday, March 22, 2006, then on Tuesday, March 28, 2006, when he was indeed terminated.  A period of seven days is undoubtedly short enough to give rise to an inference of causation.  See Pisano, 2011 WL 1097554, at *13 (plaintiff's termination less than one month after his protected speech was sufficient on its own to withstand summary judgment).  Moreover, the fact that Defendants might have been contemplating Caruso's termination before his grand jury testimony, (Oral Arg. Tr., June 13, 2013 ("Tr."), 16:16-19), is not determinative.  As the Second Circuit stated in Nagle, "an adverse employment action occurs on the date that a decision was formally reached. . . . [A]n employer cannot insulate himself from liability at the summary judgment stage simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct."  Nagle, 663 F.3d at 110.  Thus, Caruso's showing of temporal proximity "suffices to make out a prima facie claim of retaliation under the First Amendment."  See id. at 111.

Even if temporal proximity was insufficient to satisfy the causation element in this case,[15] contrary to Defendants' contention, there is evidence in the record from which a reasonable jury could infer that Caruso's testimony was a "substantial motivating factor" in Defendants' decision

_____

[15]     Temporal proximity may not be sufficient to establish an inference of causation where "gradual adverse job actions began well before the plaintiff had ever engaged in the protected activity."  See Smith v. Cnty. of Suffolk, No. 10 Civ. 1397 (ARL), 2013 WL 752635, at *14 (E.D.N.Y. Feb. 27, 2013).  As discussed in detail in § I.1.A.4, there were several conversations regarding the status of Caruso's job prior to his March 28th termination and the decision had previously been made to transfer him within the DOI.  The decision to transfer Caruso—to a position with the same salary and title and additional responsibilities—does not constitute an adverse action.  See Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y., 310 F.3d 43, 51 (2d Cir. 2002) ("A lateral transfer that does not result in a reduction in pay or benefits" is not an adverse employment action unless it "alters the terms and conditions of the plaintiff's employment in a materially negative way.").  Assuming it does, however, there remains sufficient evidence in the record to raise an inference of causation.

to terminate him.[16]   In so concluding, the Court looks to the disputed evidence in the record regarding Arsenault's reaction to Caruso's testimony.  Although Arsenault testified that he was "very pleased" with Caruso's grand jury testimony, Caruso testified that Arsenault reacted "with an attitude" towards Caruso's subsequent questions about his testimony.  Indeed, there is a dispute as to whether the two even spoke following Caruso's testimony.  As Judge Engelmayer noted in his January 18, 2012 order, Arsenault's satisfaction with Caruso's testimony remains a critical factual issue.  "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision."  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (citing Piesco, 933 F.2d at 1149).

A jury may also draw an inference of causation from additional circumstantial evidence, including Roach's March 24, 2006 email, wherein he wrote that he and Commissioner Gill Hearn were debriefed by Arsenault on Caruso's grand jury testimony regarding the Walker's meeting.  He reported that "[a]s as result of this conversation, on Tuesday and Wednesday, [Arsenault, Landa] and Dan Brownell spoke repeatedly and we all agreed that Mike had to leave DOI."  (Id.)

---

[16]      The Court rejects Defendants' argument that Anemone v. Metropolitan Transportation Authority, 629 F.3d 97 (2d Cir. 2011), requires a finding that temporal proximity is insufficient to satisfy the causation element here.  In Anemone, the Second Circuit did not review the causation element of the plaintiff's retaliation claim.  Rather, in its Mount Healthy analysis, it simply affirmed the district court's determination that, "while the close proximity of the [protected activity and adverse action] might ordinarily give rise to an inference that an impermissible motive prompted [the adverse action]," the timing in that case "reflected instead the steady accumulation of misconduct on [the plaintiff's part]."  Id. at 120.  In any event, although there is evidence here that Caruso's position at DOI was in flux in the weeks leading up to his grand jury testimony, there nonetheless exists evidence in the record that raises questions of fact as to Defendants' motivation for terminating him shortly after his testimony, as opposed to simply following the existing plan of transferring him to another position.

An inference of motivation can further be drawn from Cattafesta's notes from her call with Crowe, during which Crowe discussed his March 27, 2006 call with Commissioner Gill Hearn regarding Caruso's departure. The note states:

> Things changed on Tuesday 21st.
> 1. The phone calls December 2004
> 2. After she was briefed by Walter @ Caruso's grand jury testimony

(Pl. Ex. K.)[17] Neither Commissioner Gill Hearn nor Crowe recalls her making this statement, although, as noted below, Crowe's notes from his call with Gill Hearn suggest that the grand jury was discussed. This evidence raises disputed issues of fact regarding Defendants' motivations for terminating Caruso.

Accordingly, in light of the temporal proximity between Caruso's grand jury testimony and his termination—which is sufficient on its own to demonstrate causation—as well as additional circumstantial evidence of causation in the record, the Court finds that Caruso has demonstrated a prima facie case of retaliation for his First Amendment activity.

### 4.    Defendants' <u>Mt. Healthy</u> Defense

A defendant may rebut a prima facie showing of retaliation by demonstrating, that, "even if there is evidence that the adverse employment action was motivated in part by the protected speech, . . . it would have taken the same adverse action in the absence of the protected speech."

---

[17]    Defendants raise a colorable argument that Cattafesta's note is inadmissible double hearsay. See Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d 247, 262-64 (S.D.N.Y. 2002). The Court, however, does not have sufficient information at this time to determine whether Crowe's statement to Cattafesta appropriately falls within the agency exception set forth in Federal Rule of Civil Procedure 801(d)(2)(D). See Fed. R. Civ. P. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rules provided in these rules."); Harris v. Queens Cnty. Dist. Atty.'s Office, No. 08 Civ. 1703 (CBA), 2012 WL 832837, at *8-9 (E.D.N.Y. Mar. 12, 2012). In any event, the Court's decision to deny Defendants' motion for summary judgment on Caruso's retaliation claims would remain the same absent reliance on Cattafesta's notes.

Anemone, 629 F.3d at 114.  "The constitutional principle at stake [i.e., the freedom from retaliation for protected speech,] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the protected conduct."  Id. at 115 (quoting Mount Healthy, 429 U.S. at 285-86).  Moreover, where the plaintiff's conduct was a "unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act, . . . claims of alleged retaliation for the exercise of a constitutional or statutory right require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct."  Anemone, 629 F.3d at 114 (quoting Greenwich Citizens Comm., Inc. v. Counties of Warren & Wash. Indus. Dev. Agency, 77 F.3d 26, 33 (2d Cir. 1996)).

The Court cannot find as a matter of law that Defendants would have made the decision to terminate Caruso in the absence of his grand jury testimony so as to entitle them to summary judgment.  It is undoubtedly true that DOI executives had deep reservations about Caruso's relationship with Kerik as the investigation was escalating in early 2006.  Some action with regard to Caruso was deemed necessary because DOI understandably believed that, "once Kerik was charged . . . questions would be raised why the problems giving rise to the charges were not discovered sooner," and "DOI would no longer be able to defend Caruso . . . with the argument that [he] had no real friendship with Kerik."  (Defs. Mem. 22-23.)  They also anticipated "the inevitable 'firestorm' of bad press and doubts about DOI's independence that would result from the disclosure" of the 2004 phone calls with Kerik and Pinero, which although "not illegal [or] unethical," were "an error in judgment."  (Id. at 21; Defs. Ex. L.)

It is equally true, however, that the decision reached in early March 2006—prior to Caruso's grand jury testimony—was to transfer him within DOI and not to terminate him.

Indeed, there is evidence in the record that although Commissioner Gill Hearn had been advised by Landa, among others, to terminate rather than transfer Caruso, she decided against their recommendations.  (Gill Hearn Dep. 14:14-15:7 ("Against the advice of various executives who urged and with sadness felt that [Caruso] had become [a] distraction and a liability for the department and was tarnishing the [D]epartment's good name," she decided to "offer him the transfer," rather than terminate him.).)  This decision was communicated to Caruso on March 10, 2006.  Although there may have been some informal mentions to Caruso of possible resignation, (see Landa Mem at 2; Brownell Dep. 107:23-108:2), and there is evidence that Caruso began exploring employment options outside of DOI at that time, the decision to transfer him remained intact as late as the morning Caruso's grand jury testimony, March 21, 2006.

What ensued between March 21, 2006 and March 28, 2006 so as to lead to Caruso's termination rather than transfer remains in dispute between the parties.   According to Defendants, the ultimate decision to terminate Caruso was the culmination of the following: their ongoing concerns relating to Caruso's relationship with Kerik (particularly in light of the forthcoming indictment); Caruso's "belligerent" reaction to their decision to transfer him; his interest in finding a new job outside of DOI; his use of DOI as his "employment arm;" and his response to Defendants' request for his resignation.  (See, e.g., Defs. Mem. 20-21; Gill Hearn Dep. 25:6-9 ("Caruso's behavior was "unacceptable, insubordinate, belligerent . . . from start to finish, beginning in my office [on March 10th] and ending" in the March 24, 2006 conversation.); Arsenault Dep. 25:6-9 (Caruso's response to the proposed transfer was a reason, among others, for his termination).)  Most of these reasons, however—with the exception of his reaction to Defendants' request for his resignation on March 24, 2006—appear to have supported Defendants' continued decision, as of the morning of Caruso's grand jury testimony on March

40

Case 1:06-cv-05997-RA   Document 115   Filed 09/26/13   Page 41 of 45

21, 2006, to *transfer* Caruso.  Although both Commissioner Gill Hearn and Landa testified that Caruso's grand jury testimony had no bearing on the Commissioner's decision to terminate him, there remains a factual issue as to why the decision to transfer him changed to a decision to terminate him after March 21st.

Indeed, there is evidence in the record from which a jury could conclude that the decision changed as a result of Caruso's grand jury testimony.  As noted above, on what appears to be the day of Caruso's testimony, Arsenault debriefed Commissioner Gill Hearn and Roach about the testimony, informing them that "the 'Walker's dinner' had become a key issue in the case," and that Caruso "did not report this meeting at the time to DOI."  (Pl. Ex. A.)  According to Roach, it was then that he and Gill Hearn "learned for the [first] time" that Caruso was a "first hand witness" to Kerik's lobbying of TWC "who did nothing [about it] as IG and violated his duty under EO 16."  (Id.)  As a result of this conversation, several of the executives met and agreed that Caruso "had to leave DOI."  (Pl. Exs. A & C.)  Moreover, at a meeting held on March 29, 2006 with Crowe, Cattafesta, Julio Rodriguez and Daniel Alejandro, the Deputy Inspector Generals supervised by Caruso (the "Deputy Inspector Generals"), as well as Arsenault and Vinny Greene, Deputy Commissioner of DOI, Arsenault and Greene discussed the grand jury as part of their explanation for Caruso's termination and further stated that Kerik's potential trial "hinge[d] on the Walker's meeting."  (See Julio Rodriguez Dep. ("Rodriguez Dep.") 32:14-18; Cattafesta Dep. 54:9-22, 56:18-22.)  Crowe's notes from his March 27, 2006 call with Gill Hearn regarding Caruso also reflect that they discussed his grand jury testimony.  (Crowe Dep. 63:9-12 ("It says grand jury dash role, present for meeting, then in the upper right-hand part it says RGH updated by Walter 21st.").)  Together, this evidence could permit a reasonable jury to conclude that Caruso would not have been terminated in the absence of his testimony.

At trial, a jury may well credit Defendants' arguments raised above and/or conclude that Defendants were "dissatisfied" with Caruso's poor judgment with respect to Kerik and his "fail[ure] to report [Kerik's] misconduct" at the Walker's meeting, which "does not relate to the testimony" but does reflect his "competence as an Inspector General." (Defs. Reply 7-8; see also Landa Dep. 70:20-25; Tr. 24:1-19 (even if one were to attribute the March 24th email to Gill Hearn, it shows only that Defendants were alarmed by his inaction with respect to Kerik, not that he "testified poorly").) There is credible evidence in the record to support these conclusions. For example, the Deputy Inspector Generals were notified that the decision to terminate Caruso was informed in part by his presence at the Walker's meeting and subsequent failure to report it. (See Cattafesta Dep. 40:3-12; Crowe Dep. 62:9-16; Rodriguez Dep. 24:15-17; Alejandro Dep. 17:6-10; see also Landa Dep. 38:3-41:24, 57:6-15.) The remainder of the note Crowe prepared following his call with Gill Hearn on March 27, 2006 also stated: "Bernie Interstate illegal behavior in Mike's presence. Mike as buddy, not DOI. Didn't tell Diana Lee, no one from DOI. Official misconduct. COIB violation." (Crowe Dep. 63:12-18.) Moreover, at the March 29, 2006 meeting with the Deputy Inspector Generals, Arsenault and Greene indicated that Caruso's termination was due in part to his "bad judgment" with Kerik and the resulting "appearance problem" for DOI. (See Cattafesta 39:2-15; Crowe Dep. 88:17-89:11; Daniel Alejandro Dep. ("Alejandro Dep.") 16:8-12.) In that regard, they referenced Caruso's 2004 phone calls with Kerik and Pinero. (See, e.g., Crowe Dep. 89:12-90:14; Alejandro Dep. 16:21-3; Cattafesta Dep. 68:3-69:5; Rodriguez Dep. 24:2-18, 31:21-32:7; Greene Dep. 56:7-57:7).)[18]

---

[18] There is some indication that the deputies were told that Caruso had not disclosed such calls to the executive staff at the time they occurred. (See, e.g., Crowe Dep. 37:5-38:15, 62:6-16; Rodriguez Dep. 31:21-25.) As Caruso notes, however, the record is clear that he did so during the December 27, 2004 meeting with Commissioner Gill Hearn, Landa and Arsenault.

Ultimately, however, "it is for a jury to attempt to disentangl[e] the permissible from the impermissible reasons for [a plaintiff's] termination, not this Court." Anderson v. State of N.Y., Office of Ct. Admin. of Unified Ct. Sys., 614 F. Supp. 2d 404, 431 (S.D.N.Y. 2009).  Thus, despite the foregoing evidence that may support Defendants' termination of Caruso, summary judgment must be denied, as "the weighing of the evidence[] and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010).

Accordingly, Defendants' motion for summary judgment on its Mount Healthy defense is denied.

### 5.   **Pickering** Balancing

Defendants may also be entitled to summary judgment if they can prove that Caruso's protected speech "was likely to disrupt [DOI's] activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." See Anemone, 629 F.3d at 115. This requires a balancing of Caruso's First Amendment interest with Defendants' interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." See Pickering, 391 U.S. at 568.  The Second Circuit has articulated a three-step test for analyzing this defense.  "[A] government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." Anemone, 629 F.3d at 115 (quoting Johnson v. Ganim, 342 F.3d 105, 114 (2d Cir. 2003)).

Defendants have not moved for summary judgment on this ground, nor has either party submitted specific evidence or arguments regarding this balancing, and summary judgment is thus inappropriate on this issue.  It may, however, be raised at trial.[19]

**B.    Caruso's State Law Claims**

Caruso also brings the following state law claims: retaliation for exercising his right of free speech and to testify truthfully as a witness in a grand jury proceeding under the New York Constitution; wrongful discharge; and defamation. Defendants also move for summary judgment on these claims, to which Caruso does not respond.  Because free speech retaliation claims brought by public employees under the First Amendment to the U.S. Constitution and the New York State Constitution are subject to the same analysis discussed above, Defendants' motion for summary judgment is denied as to these claims for the reasons previously outlined.  See Almontaser v. N.Y.C. Dep't of Educ., No. 07 Civ. 10444 (SHS), 2009 WL 2762699, at *2 n.1 (S.D.N.Y. Sept. 1, 2009) (citing Zelnick v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)).

Defendants' motion is granted, however, as to Caruso's wrongful discharge and defamation claims.  First, New York does not recognize a tort of wrongful discharge for at-will employment.  See Horn v. N.Y. Times, 100 N.Y.2d 85, 96 (2003).  As to his defamation claim, Caruso appears to allege in his complaint that Arsenault defamed him by "provid[ing] to DOI staff false reasons for [his] termination."  (Compl. ¶ 43.)  "Under New York law, the elements of a defamation claim are 'a false statement, published without privilege or authorization to a third party, constituting fault . . . and it must either cause special harm or constitute defamation per

---

[19]     The Pickering balancing test is "generally a matter of law for the Court to decide, but in some instances, questions of fact will need to be resolved by a factfinder before the [C]ourt can apply the test."  Pisano, 2011 WL 1097554, at *9 (citing Johnson, 342 F.3d at 114).

se." <u>Peters v. Baldwin Union Free Sch. Dist.</u>, 320 F.3d 164, 169 (2d Cir. 2003) (quoting <u>Dillon</u>

<u>v. City of N.Y.</u>, 261 A.D.2d 34 (1999)). A "qualified privilege extends to a communication

made by one person to another upon a subject in which both have an interest." <u>Liberman</u>

<u>v.Gelstein</u>, 80 N.Y.2d 429, 437 (1992). The Court is doubtful that Caruso could satisfy the

elements of a defamation claim. In any event, Arsenault's statements were within the scope of

the qualified privilege as his statements regarding the reasons for Caruso's termination were

made to the Deputy Inspector Generals who also had a clear interest in the fate of their

supervisor.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is denied in part

and granted in part. Defendants' motion is denied as to Caruso's federal and state retaliation

claims and granted as to Caruso's wrongful discharge and defamation claim. The Clerk of Court

is respectfully directed to close the motion at Docket Number 94.

A telephone conference has been scheduled in this matter for October 3, 2013 at 2:30

p.m. The parties are directed to jointly call Courtroom Deputy Allison Cavale at (212) 805-0162

at that time.

SO ORDERED.

Dated:      September 26, 2013
            New York, New York

Ronnie Abrams
United States District Judge

45